The PEOPLE of the State of Colorado, Complainant,

v.

Arlan I. PREBLUD, Attorney–Respondent.

No. 88SA137.

Supreme Court of Colorado, En Banc.

Nov. 28, 1988.

Linda Donnelly, Disciplinary Counsel, Denver, for complainant.

Plaut/Lipstein/Cohen/P.C., Frank Plaut, Lakewood, for attorney-respondent.

LOHR, Justice.

The Disciplinary Prosecutor filed a formal complaint with the Supreme Court Grievance Committee charging the respondent, Arlan I. Preblud, with violating C.R. C.P. 241.6(1), (3), and (5) as well as DR 1–102(A)(1) and (3) [1] based on his conviction in United States District Court of securities fraud, 15 U.S.C. § 78j(b) (1982). The respondent admitted the facts upon which those charges of professional misconduct were based. He also admitted that his misconduct established the charged violations. A hearing board recommended that the respondent be suspended from the practice of law for two years. A hearing panel agreed with the board's findings and conclusions, but recommended that the respondent receive a suspension of one year and one day. The Disciplinary Prosecutor excepted to this recommendation, contending that it was unduly lenient. After consideration of the briefs and the record in this matter, we accept the findings and conclusions of the grievance committee. However, we determine that the appropriate discipline for the respondent's professional misconduct is suspension from the practice of law for a period of three years and assessment of the costs of this grievance proceeding.

## I.

Preblud was admitted to the Colorado bar on October 4, 1966, and is registered as an attorney on the records of this court. He therefore is subject to the jurisdiction of this court and of the grievance committee in all matters relating to the practice of law. C.R.C.P. 241.1(b), 241.2. The following facts are summarized from the grievance committee's findings. These findings are based on clear and convincing evidence, including the respondent's stipulation, as presented to the grievance committee hearing board.

The respondent pleaded guilty and was convicted on May 23, 1987, in the United States District Court for the District of Colorado of one count of securities fraud, 15 U.S.C. § 78j(b) (1982).[2] Securities fraud is a felony and therefore a serious crime as defined in C.R.C.P. 241.16(e). While the criminal charge was pending, the respondent voluntarily surrendered his license to practice law in January of 1986. In June 1986, after the respondent's conviction, we ordered immediate suspension of his license. The United States District Court assessed a $10,000 fine against the respondent and sentenced him to two years imprisonment. Accordingly, the respondent was incarcerated in Leavenworth Prison from July 21, 1986, to July 31, 1987, and was placed in a halfway house in Denver from August 1, 1987, to December 24, 1987. He has been prohibited from practicing law since he first surrendered his license.

After the respondent was admitted to practice law in Colorado in 1966, he developed a successful high-volume domestic relations practice and conducted that practice with the same firm until 1980. He was experiencing professional "burn-out" and elected to make a fundamental career change. The respondent left the private practice of law to accept an offer to perform personal legal work for four principals of OTCNet, a Denver penny-stock brokerage firm and underwriter. He knew very little about securities law and explained that fact to his employers.

■ The respondent's employers devised a scheme to purchase secretly twenty percent of a new public stock offering being underwritten and managed by OTCNet.

---

1. The complaint also charged the respondent with a violation of DR 1–102(A)(4) (engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation). The findings of the hearing board make no mention of this charge.

2. This section makes unlawful the use of "any manipulative or deceptive device or contrivance in contravention" of the rules and regulations of the Securities and Exchange Commission. 15 U.S.C. § 78j(b) (1982).

Such a purchase, if undisclosed, constitutes securities fraud under the regulations of the United States Securities and Exchange Commission (SEC). To implement this scheme, the employers set up a Swiss affiliate and supplied $404,000 to an intermediary to accomplish the stock purchase. The scheme shortly resulted in $1,000,000 in gain for the employers through resale of the stock to other investors at the prevailing market price after the initial public offering had been completed.[3]

Preblud was involved indirectly in the fraudulent transaction. He was responsible for delivering the $404,000 in cashier's checks to the intermediary. Although he did not know then that the money would be used for the clandestine purchase of a large portion of one of OTCNet's new stock issues, he was concerned that the purpose of the investment was tax evasion. Thus, the respondent obtained a memorandum for his employers that concluded that United States income taxes would be due on any gains realized from their investments. After his employers resold the stock, the respondent became aware of the profits realized through the purchase and sale. Although the respondent, because of his limited knowledge of securities law, did not understand the full legal implications of the transactions, he did realize that the employers' activities were improper. However, the respondent took no steps to determine whether his employers' conduct violated the criminal laws nor did he confront his employers with his concerns about the scheme. Preblud's felony conviction for securities fraud resulted from his involvement in these stock transactions.

## II.

The hearing board received substantial evidence of the respondent's remorse over his misconduct. Among the witnesses who testified was the Assistant United States Attorney, William Pharo, who prosecuted the criminal charge against Preblud. Pharo testified that the respondent exhibited more remorse over his misconduct than any other defendant Pharo had encountered in his fifteen years of state and federal prosecutorial experience. Pharo also testified that, in his opinion, the respondent had learned his lesson and would not present a threat of future misconduct. A member of the law firm with whom the respondent had practiced testified to the sincerity, integrity and honesty that the respondent had exhibited in the practice of family law. The hearing board heard further testimony highly favorable to the respondent from two mental health professionals who were friends of the respondent, a Denver police officer who was a long-term friend of the respondent, and the psychiatrist who had been treating the respondent for three months preceding the hearing. Letters from the SEC and the warden of the prison at Leavenworth were also received in evidence. The SEC official attested to the respondent's willing cooperation with that agency in its investigation, and the warden wrote of the respondent's exemplary conduct during his confinement in prison. This evidence generally served to corroborate the other evidence of the respondent's prior good conduct and present sincerity, and the likelihood that he would not engage in similar misconduct in the future. The respondent also testified, acknowledged his misconduct, and attested to his remorse and to his progress in understanding why he had been unable to confront his employers and report the criminal conduct.

Based upon the admissions of the respondent and the evidence presented at the hearing, the hearing board concluded that the respondent had violated C.R.C.P. 241.-6(1), (3), and (5),[4] as well as DR 1–102(A)(1)

3. The record shows that the Swiss affiliate corporation purchased the stock from OTCNet and then resold it to the respondent's employers for the initial public offering price. The $404,000 was used by the intermediary to establish Swiss bank accounts for the employers, and the money from these accounts was used to purchase the stock from the Swiss affiliate. The purpose of these transactions was to conceal the fact that the OTCNet principals were in effect purchasing part of the same public offering stock for which OTCNet was the underwriter.

4. C.R.C.P. 241.6 provides in part:

Misconduct by a lawyer, individually or in concert with others, including the following

and (3).[5] The hearing board recommended that the respondent be suspended from the practice of law in Colorado for two years and that he be assessed the costs of the disciplinary proceedings. In arriving at this recommendation, the board recognized the serious and public nature of the respondent's misconduct. At the same time, it "was convinced that Respondent did not realize his role in the criminal scheme until he was already enmeshed in it, in a technical area of law that was foreign to him. His greatest lapse was in not disclosing the scheme after becoming aware of it." The board noted that the American Bar Association's standards for lawyer discipline provide that absent aggravating or mitigating circumstances, disbarment is generally appropriate when "a lawyer engages in serious criminal conduct, a necessary element of which includes intentional interference with the administration of justice, false swearing, misrepresentation, fraud, extortion, misappropriation, or theft." ABA *Standards for Imposing Lawyer Sanctions* 5.11(a) (1986) [hereinafter "ABA Standards"]. The board concluded that the respondent's conduct would warrant disbarment in the absence of aggravating or mitigating circumstances.

As an aggravating circumstance, the board noted that the respondent had received a letter of admonition in 1974 for implying to the employer of an "adversary client" that imprisonment could result following the hearing of a then-pending con-

tempt motion. The respondent also received a letter of admonition in 1975 for attempting to influence a couple to withdraw a complaint that they had filed with the grievance committee against him. The board concluded, however, that these prior admonitions were not weighty given the remoteness in time of the misconduct and the fact that the misconduct to which they related was not similar to that involved in the present case.

In mitigation, the board found a number of factors that may be considered under the ABA Standards. These factors were (1) absence of a dishonest or selfish motive in that the respondent had not expected or realized personal gain from the illegal conduct, *see* ABA Standard 9.32(b); (2) personal emotional problems relating to the respondent's "excessive need" for acceptance by his peers, *see* ABA Standard 9.32(c); (3) timely, good faith effort by the respondent to rectify the consequences of his misconduct in that he had cooperated with the SEC in its efforts to require his former employers to return their illegal trading profits and had cooperated with the prosecutors in the SEC's enforcement actions, *see* ABA Standard 9.32(d); (4) full and free disclosure by the respondent to disciplinary authorities in that he had cooperated fully with the grievance committee, *see* ABA Standard 9.32(e); (5) inexperience in the practice of law in that although the respondent had extensive experience in domestic relations practice he was a "complete nov-

---

acts or omissions, shall constitute grounds for discipline, whether or not the act or omission occurred in the course of an attorney-client relationship:

    (1) Any act or omission which violates the provisions of the Code of Professional Responsibility;

    . . . .

    (3) Any act or omission which violates the highest standards of honesty, justice, or morality;

    . . . .

    (5) Any act or omission which violates the criminal laws of this state or any other state, or of the United States; provided that conviction thereof in a criminal proceeding shall not be a prerequisite to the institution of disciplinary proceedings, and provided further that acquittal in a criminal proceeding shall not necessarily bar disciplinary action[.]

**5.** DR 1–102 provides in part:

    (A) A lawyer shall not:

    (1) Violate a Disciplinary Rule.

    . . . .

    (3) Engage in illegal conduct involving moral turpitude.

The equivalent ABA *Model Rules of Professional Conduct* (1983) provisions are found in Rule 8.4 (Misconduct):

    It is professional misconduct for a lawyer to: (a) violate or attempt to violate the rules of professional conduct, knowingly assist or induce another to do so, or do so through the acts of another;

    (b) commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness or fitness as a lawyer in other respects[.]

ice in the field of securities law," *see* ABA Standard 9.32(f); (6) good character or reputation, *see* ABA Standard 9.32(g); (7) delay in disciplinary proceedings in that the respondent had surrendered his license in January of 1986 with the result that he has been unable to practice law since that time, *see* ABA Standard 9.32(i); (8) interim rehabilitation based upon the evidence of "every witness who had had contact with Respondent since his indictment," *see* ABA Standard 9.32(j); (9) imposition of other penalties or sanctions in that the SEC investigations had received wide publicity over a three year period, the respondent's indictment and sentence had been widely publicized and the respondent had served one year in Leavenworth Prison, *see* ABA Standard 9.32(k); (10) remorse in that the respondent had "expressed unreserved shame at embarrassing his profession and humiliating his family," *see* ABA Standard 9.32(1); and (11) remoteness in time of the respondent's prior disciplinary offenses, *see* ABA Standard 9.32(m). Considering these mitigating factors, the board recommended that the respondent be suspended from the practice of law for two years and that he be assessed the costs of the disciplinary proceedings.

The hearing panel by a vote of four to two rejected this recommendation of a two year suspension and instead recommended a suspension of one year and one day. The dissenters favored the hearing board's recommendation. The majority of the panel believed that a one year and one day suspension was appropriate given the fact that the respondent had in effect been suspended since June 20, 1986, the date of his immediate suspension following his conviction.

### III.

Upon consideration of the recommendations of the grievance committee, this court issued a rule to show cause why a three-year suspension should not be imposed for the respondent's professional misconduct. The parties filed briefs directed to this issue. We now conclude that a suspension for a period of three years is the appropri-

ate discipline to impose. In arriving at this conclusion, we are cognizant of the many mitigating factors found by the hearing board. The evidence amply supports the hearing board's finding that the respondent is genuinely remorseful, and that it appears very unlikely that he will engage in similar misconduct in the future. Nevertheless, we conclude that great weight must be given to the seriousness of the misconduct itself. *See People v. Loseke,* 698 P.2d 809, 810 (Colo.1985) (considering nature of misconduct in determining appropriate sanction).

■ The scheme that the respondent's employers devised resulted in the fraudulent taking of $1,000,000 from the investing public. The respondent knew that his employers' investment scheme was wrong, although he did not have the detailed knowledge of securities law necessary to evaluate the criminal consequences of that misconduct. While the justifiable publicity that this incident received operated as a form of punishment to the respondent, it also strongly tended to bring the legal profession into disrepute. We believe that only weighty mitigating factors can justify the imposition of any sanction other than disbarment under these circumstances. *See People v. Loseke,* 698 P.2d at 810 (respondent's mitigative efforts insufficient to justify lesser sanction than disbarment); ABA Standard 5.11(a) (disbarment generally appropriate when a lawyer engages in serious criminal conduct).

■ After considering these factors, we conclude that the respondent should be suspended for a period of three years and be required to pay the costs related to this proceeding. We believe this disciplinary sanction represents a fair accommodation of both the seriousness of the misconduct and the weight of the mitigating factors. Generally, a three-year suspension is deemed appropriate only for lawyers committing crimes other than those listed in ABA Standards 5.11 (serious criminal conduct). *People v. McPhee,* 728 P.2d 1292, 1294 (Colo.1986). However, even though the respondent has engaged in serious criminal conduct here, we conclude that in

lieu of disbarment a three-year suspension is appropriate in light of the great weight of the mitigating evidence. *See* ABA Standards at 6 ("The ultimate sanction imposed will depend on the presence of any aggravating or mitigating factors in [a] particular situation."), *applied in People v. Grenemyer,* 745 P.2d 1027 (Colo.1987) (aggravating factors justify sanction of disbarment). We are impressed with the respondent's long record of integrity that preceded this incident and with his remorse and determination not to repeat such conduct in the future. Of great importance as well is the fact that the respondent served a year in prison for his criminal behavior.

Accordingly, it is ordered that the respondent, Arlan I. Preblud, be suspended from the practice of law for a period of three years commencing on the date of the announcement of this opinion. The respondent is ordered to pay costs of $1,242.99 to the Supreme Court Grievance Committee, 600 Seventeenth Street, Suite 500S, Denver, Colorado within sixty days from the date of the announcement of this opinion. The respondent's reinstatement is conditioned upon compliance with C.R.C.P. 241.-22(b) and full payment of costs.

ERICKSON, J., dissents and VOLLACK, J., joins in the dissent.

ERICKSON, Justice, dissenting:

I respectfully dissent. In my view, the criminal conduct of the respondent, Arlan I. Preblud (Preblud) requires disbarment. A lesser disciplinary sanction depreciates the seriousness of the respondent's willful participation in a manipulative scheme that resulted in fraudulent profits in excess of $1,000,000 and underplays Preblud's actions in the fraudulent transactions.

The federal grand jury returned a seven-count indictment against respondent Preblud, Joseph A. Pignatiello, and Juan Carlos Schidlowski, as principals of a conspiracy. 18 U.S.C. § 2. Preblud was alleged to have been involved in the criminal acts set forth in five of the indictment's seven counts. Count I of the indictment charged a conspiracy, 18 U.S.C. § 371, and detailed the nuances of the agreement between the principals as co-conspirators in perpetrating fraudulent sales of stock of Balboa Exploration Company and Piezo Electric Products, Inc. Count II alleged that Preblud and his co-defendants knowingly and willfully engaged in fraud in violation of 15 U.S.C. §§ 78j(b), 78ff(a), and 17 C.F.R. 240.-10b–5, by creating and operating a manipulative scheme to profit from the sale of Balboa Exploration Company stock. Count III charged similar criminal conduct in connection with the sale of Piezo Electric Products, Inc. stock. Count IV alleged violations of 18 U.S.C. § 1001 for filing a prospectus for Balboa Exploration Company containing false, fictitious, and fraudulent representations of material facts and concealed the material facts by trick, scheme, and device. Count V contained the same allegations in connection with the filing of a prospectus for Piezo Electric Products, Inc. Count VI alleged that Joseph V. Pignatiello violated 18 U.S.C. § 1001 by fraudulently concealing his interest in an account with OTC Net, Inc. Count VII charged that Juan Carlos Schidlowski committed similar acts in violation of 18 U.S.C. § 1001.

As part of the plea agreement, Preblud agreed to plead guilty to Count II of the indictment and all other charges were dismissed. He was fined $10,000 and sentenced to two years imprisonment. His involvement in the illicit scheme to defraud was summarized by the United States Attorney and approved by the respondent and states as follows:

The government's evidence would show that:

JOSEPH V. PIGNATIELLO was a principal of OTC Net, Inc., along with Juan Carlos Schidlowski, Kim D. Rust and Daniel Walters. OTC Net, Inc., was a Denver based brokerage firm primarily involved in underwriting over-the-counter public stock distributions. In early 1981, the principals of OTC NET, Inc., decided to expand their marketing capabilities to Europe by starting a Swiss affiliate brokerage firm. In February of 1981, ARLAN I. PREBLUD, Schidlowski, Pignatiello, and Rust travelled to Switzerland

to make the legal arrangements necessary to establish this Swiss affiliate which was named OTECENET, S.A. PREBLUD became the president of this company. Also, in early 1981, the principals of OTC Net, Inc., were approached by another brokerage firm and asked to be the primary underwriter of the public distribution of shares of stock of Balboa Exploration Company. Pignatiello, Schidlowski, Rust and Walters agreed to distribute the stock, but decided to increase the number of shares from 15 million to 20 million allocating 4,540,000 shares to OTECENET for distribution to Europe. Pignatiello, Schidlowski, Rust and Walters then decided to purchase the majority of the shares allocated to OTECENET through accounts to be opened for their benefit at Swiss financial institutes.

On March 16, 1981, Pignatiello, Schidlowski, Rust and Walters borrowed $450,000 from Metro National Bank, Denver, Colorado for the stated purpose of purchasing "furniture, fixtures and telephone equipment." $404,000 of the loan proceeds were converted to cashiers checks payable to Mannin Trust, Ltd., which were transported to Europe by PREBLUD, who used the money to fund Swiss bank accounts through which 4,040,000 shares of new issue Balboa Stock were purchased from OTECENENT for the benefit of Pignatiello, Schidlowski, Rust and Walters.

On April 6, 1981, Balboa Stock began trading in the aftermarket. In the first day of aftermarket trading the price of Balboa Stock went from $.10 to $.50. Between April 8, 1981, and April 16, 1981 the shares purchased through the Swiss bank accounts were sold back to OTC Net, Inc., at a profit of approximately $1,000,000. OTC Net, Inc., in turn distributed this stock to customers who paid more than $.10 a share and were not informed in any way that shares of the initial public distribution had been secretly purchased by principals of OTC Net, Inc., through Swiss accounts. PREBLUD caused a portion of these proceeds

to be wire transferred from Colorado to New York.

The profits in the numbered Swiss bank accounts were eventually transferred back to the United States. To disguise the significance of these transfers, foreign corporations were created for the principals of OTC Net, Inc. PIGNATIELLO, Schidlowski, Rust and Walters were the beneficial owners of these corporations through a power of attorney. Initially, Preblud was given this power of attorney. Documents were drafted to reflect on their face that the foreign corporations were lending money to, or for the benefit of, the principals of OTC Net, Inc. The loan documents were dated to correspond with when the proceeds from the stock sales were coming back to the United States. To further add legitimacy to these "loans," liens were recorded against Schidlowski's and Pignatiello's residences, evidencing security for an indebtedness to one of the foreign corporations.

The government's evidence would further show that ARLAN I. PREBLUD was an attorney licensed to practice law in Colorado during the time these transactions occurred and was aware it was unlawful to employ manipulative deceptive devices in connection with the sale of securities.

After the respondent was sentenced to prison, he cooperated fully with the prosecution. The record reflects that Preblud has shown remorse and is a law abiding citizen who is actively involved in civic activities. He has suffered imprisonment and has paid substantial monetary penalties. However, all of the respondent's activities that the majority describes as mitigating factors justifying suspension rather than disbarment occurred after the respondent's fraudulent acts were discovered and after he was indicted.

During the entire time that the respondent and his co-conspirators were carrying out the steps necessary to effectuate the fraudulent scheme, Preblud was aware of the unethical, dishonest, and fraudulent nature of the plan. The transcript of the disciplinary proceeding reveals that Pre-

blud understood the mechanics of the scheme and actively participated in furtherance of it. He acted as the courier for the conspiracy, was the president of a corporation created to carry out the fraudulent scheme, and caused funds to be transferred to a numbered Swiss bank account in an attempt to maintain anonymity. The respondent's actions show a calculating, willing, and active participation in a pernicious scheme to profit from manipulating the market, a character completely irreconcilable with those ideals an attorney is sworn to uphold.

While I am cognizant of Preblud's extraordinary effort to rehabilitate himself and the supportive testimonials submitted on his behalf, I feel that his conduct was so egregious as to warrant disbarment. This conclusion is fully supported by C.R.C.P. 241.6 and Standard 5.11 of the American Bar Association Standards for Imposing Lawyer Sanctions. I note that Preblud voluntarily surrendered his license to practice law. in January 1986 and was suspended in June 1986. In light of our decision in *People v. Pacheco*, 198 Colo. 455, 608 P.2d 333 (1979), I would commence the eight-year period for readmission after disbarment from the date he surrendered his license in January 1986. The respondent should be permitted to apply for readmission in accordance with the provisions of C.R.C.P. 241.22(a).

I am authorized to say that Justice VOLLACK joins in this dissent.