The PEOPLE of the State of
Colorado, Complainant

v.

Eva Melissa SUGAR, Respondent.

No. 14PDJ102.

Office of the Presiding Disciplinary Judge
of the Supreme Court of Colorado.

Sept. 23, 2015.

**OPINION AND DECISION IMPOSING
SANCTIONS PURSUANT TO
C.R.C.P. 251.19(b)**

### I. *SUMMARY*

In August 2014, Respondent pleaded guilty
to the felony charge of conspiracy to defraud

the United States when she assisted more than 150 clients to avoid tax reporting requirements. Respondent was sentenced to eighteen months in prison. The PDJ entered judgment as a matter of law on the single claim in this matter, which alleges a violation of Colo. RPC 8.4(b) (a lawyer shall not commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness, or fitness as a lawyer). Based on the established facts, and taking into account the applicable mitigating and aggravating factors, the Hearing Board concludes that the only condign sanction in this matter is disbarment.

## II. PROCEDURAL HISTORY

On December 2, 2014, the People filed a "Petition for Immediate Suspension" requesting that Respondent be immediately suspended from the practice of law pursuant to C.R.C.P. 251.8 and 251.20(d). The PDJ issued an order to Respondent to show cause on December 3, 2014. Respondent did not file a response or request a hearing under C.R.C.P. 251.8(b)(3). Accordingly, the PDJ issued a report to the Colorado Supreme Court on December 22, 2015, recommending that Respondent be immediately suspended. The Colorado Supreme Court adopted that recommendation and suspended Respondent on December 30, 2014.

The People filed a disciplinary complaint on January 29, 2015, alleging that Respondent violated Colo. RPC 8.4(b). Respondent filed an answer on March 26, 2015, admitting the allegations and the claims in the complaint. The People then filed an unopposed motion seeking judgment on the pleadings on April 14, 2015. The PDJ granted that motion and entered judgment against Respondent on the sole claim pleaded in the People's complaint.

At the hearing on June 30, 2015, the parties presented opening statements, and counsel for Respondent elicited testimony from Deborah Roxanne Sugar, Respondent's sister. The PDJ also admitted stipulated exhibits 1–4. Members of the Hearing Board inquired why Respondent had declined to appear. Counsel for Respondent represented that, though he and Respondent had discussed whether she should attend by telephone or videoconference, the "logistics" involved in appearing at the hearing from prison via teleconference "just didn't make that work."[1] Nevertheless, Respondent's counsel moved for a continuance so Respondent could testify on her own behalf, and the People did not object. The PDJ continued the hearing to August 19 for the limited purpose of allowing Respondent to make a statement concerning sanctions and for presentation of the parties' final arguments. On August 19, the Hearing Board heard Respondent's testimony and the parties' closing arguments.

## III. FINDINGS OF FACT AND RULE VIOLATIONS

 Respondent took the oath of admission and was admitted to the bar of the Colorado Supreme Court on October 25, 1989, under attorney registration number 19003.[2] She is thus subject to the jurisdiction of the Hearing Board in these disciplinary proceedings.[3]

On August 4, 2014, Respondent entered a plea of guilty to one felony count of violating 18 U.S.C. section 371, Conspiracy to Defraud the United States, in *United States v. Eva Melissa Sugar* in the United States District Court for the District of Colorado, case number 13–CR–00193–JLK–01. That count alleged that Respondent did "unlawfully, voluntarily, intentionally, and knowingly conspire, combine, confederate, and agree together" for the "purpose of impeding, impairing, obstructing, and defeating the lawful Government functions of the Internal Revenue Service ('IRS') of the Treasury Department in the ascertainment, computation, assessment, and collection of the revenue,

1. Respondent's current address is # 39469–013, FMC Carswell, Federal Medical Center, P.O. Box 27137, Fort Worth, Texas 76127.

2. Compl. ¶ 1; 2d Am. Answer ¶ 1. Respondent's registered business address is 3801 East Florida Avenue, Suite 400, Denver, Colorado 80210.

3. *See.* C.R.C.P. 251.1(b).

namely income, employment, and other federal taxes." [4]

The plea of guilty included the following elements:

1. Respondent agreed with at least one other person to violate the law;

2. One of the conspirators engaged in at least one overt act, as described in the indictment, furthering the conspiracy's objective;

3. Respondent knew the essential objective of the conspiracy;

4. Respondent knowingly and voluntarily participated; and

5. There was interdependence among the members of the conspiracy; that is, the members, in some way or manner, intended to act together for their shared mutual benefit within the scope of the conspiracy charged.[5]

Respondent's guilty plea also set forth the following factual basis:

Beginning around 1999, [Respondent] began receiving referrals from a group called Financial Fortress Associates ("FFA"). FFA promoted the use of so-called Constitutional Pure Trust Organizations ("PTOs") as part of various schemes to avoid tax reporting requirements, including transferring ownership of most or all assets belonging to a taxpayer or a taxpayer's business(es) to trusts and treating payments to the same trusts as business deductions. FFA further advised clients not to file tax returns or any other documents with the IRS on behalf of the trusts. FFA recruited clients through the internet and in seminars or "meetings" conducted in hotel conference[ ] rooms around the country, including locations in Colorado, Georgia, Texas, and other locations. At some of these meetings, [Respondent] explained how the FFA's banking program worked and others associated with FFA explained other aspects of FFA's program. Once a client joined FFA, FFA charged fees to create PTOs, to serve as trustees for the PTOs, and to provide "minutes" of purported trust activity or sign other fraudulent documents designed to make the PTOs appear to be controlled by someone other than the FFA client. The FFA then referred some of those clients to [Respondent]. For each client, [Respondent] would either create one or more Unincorporated Business Organizations ("UBO") or assign to the client a UBO she had previously created. Once the UBO was assigned, [Respondent] would maintain relevant documents associated with the UBO. [Respondent] created multiple UBOs for some clients.

For each UBO, [Respondent] also applied for and obtained an Employee Identification Number ("EIN") from the Internal Revenue Service. Both the UBOs that [Respondent] created, and the associated EINs that [Respondent] obtained, were necessary to allow FFA clients to conduct banking in the names of the UBOs rather than in their own names. [Respondent] opened a non-interest bearing account using the EIN she had obtained for each UBO. Because the account did not generate interest, the bank had no reporting requirement for the account with respect to the IRS. Nevertheless, the way the account was set up allowed the client to disguise any connection to it. Typically, in the application documents [Respondent] used to open the bank accounts, she identified herself as the account signer and trustee, using her business address as the location of the UBO. At the request of the bank's legal department, [Respondent] also began preparing documents called "Certificates of Incumbency" which were designed to legitimize the otherwise unusual circumstance of nearly all of the deposits into the UBO account constituting checks made payable to different entities—the client's PTOs. For certain UBOs, [Respondent] obtained signature stamps for individuals identified by her clients, who she then listed as "administrative assistants" or other similar title[s] on the accounts. These individuals had no duties, but provided a signature stamp that would enable checks

4. Ex. S1 at 1–2.

5. *See* Ex. S2 at 3.

to be endorsed without using the name of the actual client on the bank documents. [Respondent] charged her clients fees for her services, including an initial fee to establish the UBO, as well as an annual maintenance fee. For additional fees, [Respondent] allowed her clients to control funds in the UBO accounts through the use of blank checks that she would sign, for a fee, as the account signer or trustee. The clients would then fill in the checks, spending the money from the accounts in whatever manner they desired. [Respondent] also charged clients to photocopy bank statements, mail and sign other documents, and conduct other bank transactions such as wire transfers. [Respondent] provided these services for more than 150 clients, and in so doing, performed various overt acts in furtherance of the charged conspiracy.

FFA clients used the fictitious trust(s) and the UBO bank account to evade tax obligations by (1) causing receipts from a legitimate business to be paid to one of the fictitious entities, diverting the reportable income to the UBO bank account and thereby understating the legitimate business's gross receipts, or (2) making payments to one of the fictitious UBO entities and then deducting the payments as expenses in tax returns for the legitimate business, thereby decreasing the legitimate business's taxable income. Some FFA clients ... avoided millions of dollars in tax obligations through these methods. More typically, FFA clients ... avoided tax obligations in the range of tens to hundreds of thousands of dollars. The parties agree that the tax loss resulting from reasonably foreseeable acts and omissions of others in furtherance of [Respondent's] jointly undertaken criminal activity as part of the conspiracy is between $2.5 million and $7 million. [Respondent] did not use these methods to avoid significant tax liabilities for herself during this period,

but she failed to file personal or business tax returns for 1999–2008. [Respondent] continued to perform limited work for some FFA clients through at least April, 2008, even after IRS agents executed search warrants at her office and her house in May, 2007.[6]

On October 29, 2014, a judgment of conviction was entered and Respondent was sentenced to eighteen months in prison.[7] As part of her sentence, Respondent was ordered to pay a $5,000.00 fine.[8]

Through this conduct, Respondent violated Colo. RPC 8.4(b), which prohibits a lawyer from committing a criminal act that reflect adversely on the lawyer's honesty, trustworthiness, or fitness as a lawyer.[9]

## IV. SANCTIONS

 The American Bar Association's *Standards for Imposing Lawyer Sanctions* (1991 & Supp. 1992) ("ABA *Standards*") and Colorado Supreme Court case law guide the determination of sanctions for lawyer misconduct.[10] In imposing a sanction after a finding of lawyer misconduct, the Hearing Board must consider the duty violated, the lawyer's mental state, and the actual or potential injury caused by the lawyer's misconduct. These three variables yield a presumptive sanction that may be adjusted in consideration of aggravating and mitigating factors.

### ABA *Standard* 3.0—Duty, Mental State, and Injury

*Duty:* By engaging in a criminal scheme to assist others in defrauding the United States government—and using her law license to lend credibility to that scheme—Respondent flouted the duties she owed to the public to maintain personal honesty and integrity and to uphold the law. As the ABA *Standards* declare, "The public expects the lawyer to be honest and to abide by the law;

---

6. Ex. S2 at 5–8.

7. Ex. S4.

8. Ex. S4.

9. *See also* C.R.C.P. 251.5(b) (finding as grounds for discipline any criminal act that reflects ad-

versely on a lawyer's honesty, trustworthiness, or fitness as a lawyer).

10. *See In re Roose*, 69 P.3d 43, 46–47 (Colo. 2003).

public confidence in the integrity of officers of the court is undermined when lawyers engage in illegal conduct." [11]

*Mental State:* At the hearing on the sanctions, Respondent essentially launched a collateral attack on the elements of her conviction, asking us to accept that she was not aware of any wrongdoing or illegality until 2010, when, she said, she "made every effort to shut everything down." She testified that initially she "didn't think there was a crime going on at all," and simply failed to "connect the dots to recognize things," though she conceded that from 2004 onward she may have "turned a blind eye" to the wrongdoing. Respondent attributed her misconduct to misplaced trust in certain people, expressing embarrassment that "someone I thought was a true mentor walked me into such a sham."

After the IRS raided her office and home in 2007, she assumed that just a few people had used her services to avoid tax liabilities, she said; only in 2010, she testified, did she realize that the practice was widespread. As for why she pleaded guilty, she explained that "[m]y way of looking at it was that I had provided this service; regardless of what my intentions were, I was allowing people to do something that was wrong through those services." In short, she described the ongoing fraud as "on my watch without my knowledge."

Respondent's testimony, in effect, invites us to determine where her incompetency ends and her criminality begins. From both a factual and a legal standpoint, we conclude that Respondent knew of the tax fraud being perpetrated, and that she knowingly participated in that scheme by assisting her clients to avoid their tax obligations.

Legally, we cannot look behind the elements of Respondent's conviction. She pleaded guilty to one felony count of conspiracy to defraud the United States. That count charged her with "unlawfully, voluntarily, intentionally, and knowingly" doing

so.[12] Per C.R.C.P. 251.20(a), conviction of the crime is "conclusive proof of the commission of that crime" by Respondent. We thus accept as a matter of law that Respondent intentionally and knowingly defrauded the U.S. government.

Even if we were to reexamine the factual basis for her plea, however, we would come to the same conclusion. Respondent graduated from law school in 1987 and was admitted to the Colorado bar in 1989. By the time she began to receive referrals from FFA in 1999, she was an experienced practitioner of ten years who should have seen red flags when asked to establish bank accounts for client use without listing clients' names on any of the bank forms. Respondent also received an L.L.M. in taxation from the University of Denver[13]—an advanced education that should have made obvious to her that she was engaged in wrongdoing and that certainly provided her access to experts in the field whom she could have consulted about any misgivings about the scheme. She acted as a face of the venture in meetings around the country and recruited new clients, each from whom, she testified, she stood to earn approximately $1,500.00 in set-up fees. Following the 2007 IRS raid, when she was put on notice that the IRS was investigating FFA, Respondent continued to facilitate new and existing clients' efforts to avoid tax liabilities. Taking all of this evidence together, we can give no credence to Respondent's revisionist account of her involvement: she knowingly and intentionally counseled her clients to engage in tax fraud and tax evasion.

*Injury:* The federal government estimates that it lost between $2.5 million and $7 million in tax revenue as a result of the conspiracy in which Respondent participated. Without doubt this constitutes serious financial injury to the U.S. government and, by extension, all American citizens. Further, Respondent's participation in this criminal scheme, which was so intertwined with her

---

11. ABA *Standard* 5.0.

12. Ex. S1.

13. The Hearing Board was presented with incongruent evidence as to when Respondent was

awarded an L.L.M. degree: the factual basis of her plea states that she earned her L.L.M. in 1996, *see* Ex. S2, but she testified at the hearing that she attended the advanced tax program from 2004 through 2006.

practice of law, also upended the public's expectation that lawyers are ministers of justice who uphold the rule of law. Such behavior causes the profession serious injury.

### ABA *Standards* 4.0–7.0—Presumptive Sanction

Here, the presumptive sanction is governed by ABA *Standard* 5.11, which calls for disbarment when a lawyer engages in serious criminal conduct where a necessary element includes intentional interference with the administration of justice, false swearing, misrepresentation, fraud, extortion, misappropriation, or theft, or a conspiracy to commit any of these offenses. We thus begin with disbarment as the presumptive sanction.

### ABA *Standard* 9.0—Aggravating and Mitigating Factors

Aggravating factors are considerations that may justify an increase in the presumptive discipline to be imposed, while mitigating factors may warrant a reduction in the severity of the sanction.[14] The Hearing Board considers evidence of the following circumstances in deciding the appropriate sanction, and we conclude that four aggravating and four mitigating factors apply. We accord various levels of importance to these factors, however.

*Dishonest or Selfish Motive—9.22(b):* The People urge application of this factor, while Respondent contends that she was not dishonest because she had no knowledge of "what was going on." As discussed above, the Hearing Board rejects that narrative. Respondent also argues that it would be unfair to attribute to her a selfish motive, since she did not make the lion's share of the money, netting "only" $35,000.00–40,000.00 per year from her involvement. We disagree. That other people reaped greater financial rewards from the scheme does not diminish Respondent's culpability. Respondent assisted clients in criminal activity, and

she profited by charging for her services. We thus find this a significant factor in aggravation.

*Pattern of Misconduct—9.22(c):* Respondent engaged in a pattern of misconduct by assisting more than 150 clients to unlawfully avoid their tax liabilities over the course of a decade. This, too, is a significant aggravating factor.

*Refusal to Acknowledge Wrongful Nature of Conduct—9.22(g):* We are dismayed that Respondent failed to take responsibility at the hearing for her knowing involvement in illegal activity. We accord this factor some weight in aggravation.[15]

*Substantial Experience in the Practice of Law—9.22(i):* Respondent graduated from law school in 1987 and was admitted to the Colorado bar in 1989, so we consider her substantial experience in the practice of law an aggravating factor.

*Absence of a Prior Disciplinary Record—9.32(a):* Respondent has not been sanctioned for misconduct before. This mitigating factor is entitled to average weight.

*Personal or Emotional Problems—9.32(c):* Advancing the argument that she is entitled to mitigation for personal and emotional problems, Respondent explained that while she was participating in the tax evasion scheme her mother fell ill and passed away. She nursed her mother during that time and then cared for her father after her mother's death, which was very trying emotionally for her. The People, however, elicited testimony from Respondent's sister Deborah Roxanne Sugar, who stated that their parents' health began to falter only in 2004, well after the time Respondent embarked on her course of misconduct. As such, we see no causal link between Respondent's wrongdoing and these family misfortunes and thus give this factor only minimal weight in mitigation.

---

14. *See* ABA *Standards* 9.21 & 9.31.

15. We view this aggravating factor as the mirror opposite of the mitigating factor of remorse. *See* ABA *Standard* 9.32(*l*). We decline to apply that mitigator for the reasons described above, and based on our evaluation of her expressions of

remorse, which pivoted almost exclusively on the impact her conviction has had on her life and practice. We believe these statements leave much to be desired in terms of Respondent's acknowledgment of the effect of her actions on others, the public good, and the legal profession.

*Character or Reputation—9.32(g):* Respondent testified that she has worked hard to develop an excellent reputation in the legal community. She believes she was "giving a great service." She loved her job and her clients. "I gave them my life," she said, and her practice was "my home, my everything. That's all I really worked for." Respondent also noted that she belonged to various legal organizations and committees and held several leadership positions. She helped organize Senior Law Day for several years, was on the board of her synagogue for nine years, assisted with fundraisers, and did pro bono work. We accord this mitigating factor some significance.[16]

*Imposition of Other Penalties or Sanctions—9.32(k):* Respondent is currently in prison serving an eighteen-month sentence for her role in the conspiracy to defraud the United States government of tax revenue. Though her current incarceration is a mitigating factor, it nowise serves to address the harm Respondent's professional misconduct caused her clients and the profession. We thus assign only moderate weight to this factor.

### Analysis Under ABA *Standards* and Case Law

The Hearing Board is mindful of the Colorado Supreme Court's directive to exercise discretion in imposing a sanction and to carefully apply aggravating and mitigating factors,[17] since "individual circumstances make extremely problematic any meaningful comparison of discipline ultimately imposed in different cases."[18] Though prior cases are helpful by way of analogy, the Hearing Board is charged with determining the appropriate sanction for a lawyer's misconduct on a case-by-case basis.

The parties each have cited several disciplinary cases involving attorneys convicted of felonies, the People pointing to cases that resulted in disbarment, and Respondent referring to cases that yielded suspensions of varying lengths. Case law favors the People's position, however. The overwhelming majority of Colorado lawyers convicted of serious crimes involving fraud are ultimately disbarred.[19] For instance, in *In re DeRose,* arguably the case most factually analogous to this matter, a lawyer was disbarred for purchasing eleven separate money orders of $2,500.00 each for a client with the intent to circumvent reporting requirements.[20] He pled guilty to felony charges of structuring transactions to evade reporting requirements and aiding and abetting, and he served a four-month federal sentence.[21] Taking into account the balance of three mitigators and three aggravators—including prior disciplinary history—the Colorado Supreme Court affirmed the hearing board's imposition of disbarment.[22]

16. Respondent also mentioned several reference letters she intended to submit to the Hearing Board as exhibits to her hearing brief. We did not—nor should we—receive or consider these letters, as they were not introduced as exhibits at the hearing. But we note that we would give this mitigator no more weight than we do presently even if we had received those letters, because we are already giving her the benefit of the doubt on this score.

17. *See In re Attorney F.,* 285 P.3d 322, 327 (Colo. 2012); *In re Fischer,* 89 P.3d 817, 822 (Colo. 2004) (finding that a hearing board had overemphasized the presumptive sanction and undervalued the importance of mitigating factors in determining the needs of the public).

18. *In re Attorney F.,* 285 P.3d at 327 (quoting *In re Rosen,* 198 P.3d 116, 121 (Colo.2008)).

19. *See, e.g., People v. Nearen,* 952 P.2d 371, 372 (Colo.1998) (disbarring an attorney who pleaded guilty to two felony counts of securities fraud and money laundering); *People v. Sichta,* 948 P.2d 1018, 1020 (Colo.1997) (disbarring a lawyer who was convicted of wire fraud and securities fraud); *People v. Frye,* 935 P.2d 10, 11 (Colo. 1997) (disbarring an attorney following his conviction for conspiracy to commit securities fraud); *People v. Hilgendorf,* 895 P.2d 544, 545 (Colo.1995) (disbarring an attorney because he was convicted of making false statements to federal banks); *People v. Bollinger,* 859 P.2d 901, 902 (Colo.1993) (disbarring a lawyer following his conviction for mail fraud); *People v. Terborg,* 848 P.2d 346, 347 (Colo.1993) (disbarring a lawyer after he had been convicted of bank fraud).

20. 55 P.3d 126, 127–28 (Colo.2002).

21. *Id.* at 128.

22. *Id.* at 130–31.

Even in those cases where the lawyer has no prior record of discipline, disbarment typically has been imposed. The lawyer in *People v. Schwartz* was disbarred after pleading guilty in federal court to bankruptcy fraud and conspiracy to commit bankruptcy fraud, even though no aggravating factors were mentioned and the lawyer had no prior history of discipline.[23] Likewise, in *People v. Viar*, a lawyer was disbarred following his conviction for bribery, a class-three felony, despite his clean disciplinary record.[24] In each case, the Colorado Supreme Court found that the lawyer's lack of prior discipline was "insufficient" to justify deviating from the presumptive sanction of disbarment.[25]

Cases where sanctions less than disbarment have been levied based on similar felony convictions often hinge on the sizeable preponderance of factors in mitigation. Notably, the lawyer in *People v. Preblud*, who pleaded guilty to one count of securities fraud and was sentenced to two years in prison, was only suspended for three years, rather than disbarred, given his indirect involvement in the fraud scheme and the eleven applicable mitigating factors, among them his sincere remorse.[26] A similar result obtained in *People v. Hanks*.[27] There, the lawyer pleaded guilty to violations of the Securities Exchange Act, but the Colorado Supreme Court approved a lengthy suspension due to the presence of mitigating factors comparable to those in *Preblud*.[28] Other

similar cases resulting in suspension involved, in general, either convictions based on personal conduct not related to the lawyer's representation of clients,[29] or convictions based on misdemeanor violations.[30]

This case fits none of those patterns. Respondent's fraudulent conduct falls squarely within ABA *Standard* 5.11, prescribing disbarment. She engaged in repeated misconduct as part of her practice of law, using her law license to assist her clients in evading their tax obligations. Her misconduct resulted in millions of dollars of lost tax revenue. And the mitigating and aggravating factors in this matter stand in equipoise. All told, no extenuating circumstances have been presented that justifies deviation from the presumptive and customary sanction of disbarment. To the contrary, these facts suggest that the standard sanction of disbarment imposed in like matters ought to be imposed here, too.

## V. CONCLUSION

Respondent profited from knowingly participating in a long-running tax evasion scheme, actively assisting more than 150 clients to disobey their legal obligations by collectively defrauding the federal government of millions of dollars. Rightfully, she has been convicted and imprisoned, and rightfully, we conclude that she should be disbarred from the practice of law.

23. 814 P.2d 793, 794 (Colo.1991).

24. 848 P.2d 934, 936 (Colo.1993).

25. *Schwartz*, 814 P.2d at 794; *Viar*, 848 P.2d at 936; *see also People v. Brown*, 841 P.2d 1066, 1067 (Colo.1992) (finding that an attorney's guilty plea to bankruptcy fraud warranted the attorney's disbarment, despite the lack of a disciplinary record); *cf. DeRose*, 55 P.3d at 130 ("Conduct constituting a felony may not justify disbarment when the conduct *does not fall within the scope of ABA* Standard *§ 5.11* and there is no evidence of prior discipline.") (emphasis added).

26. 764 P.2d 822, 823–26 (Colo.1988).

27. 967 P.2d 141 (Colo.1998).

28. *Id.* at 142–44.

29. *See, e.g., People v. Mandell*, 813 P.2d 732, 732–33 (Colo.1991) (suspending for three years an

attorney who feloniously failed to report his income and filed false income tax returns for two years, where four mitigators and no aggravators applied); *People v. Petrie*, 642 P.2d 519, 519–20 (Colo.1982) (imposing a one-year-and-one-day suspension after an attorney was convicted of a felony for forging a law firm partner's signature on checks in an effort to garner about $2,000.00 in purported expenses to which he was not entitled, in light of several mitigating factors including the lawyer's insight about his self-destructive tendencies and his participation in psychiatric treatment).

30. *See, e.g., People v. Boyle*, 942 P.2d 1199, 1203 (Colo.1997) (suspending a lawyer for two years following his misdemeanor conviction for aiding and abetting aliens in obtaining entry into the United States by willful, misleading representations).

## VI. *ORDER*

The Hearing Board therefore **ORDERS**:

1. **EVA MELISSA SUGAR,** attorney registration number **19003,** is **DISBARRED.** The **DISBARMENT SHALL** take effect only upon issuance of an "Order and Notice of Disbarment." [31]

2. If applicable, Respondent **SHALL** promptly comply with C.R.C.P. 251.28(a)–(c), concerning winding up of affairs, notice to parties in pending matters, and notice to parties in litigation.

3. Respondent also **SHALL** file with the PDJ within fourteen days of issuance of the "Order and Notice of Disbarment" an affidavit complying with C.R.C.P. 251.28(d).

4. The parties **MUST** file any post-hearing motion or application for stay pending appeal with the Hearing Board **on or before Wednesday, October 14, 2015.** No extensions of time will be granted. Any response thereto must be filed within seven days.

5. Respondent **SHALL** pay the costs of these proceedings. The People **SHALL** file a "Statement of Costs" **on or before Wednesday, October 7, 2015.** Any response thereto must be filed within seven days.

[31.] In general, an order and notice of sanction will issue thirty-five days after a decision is entered pursuant to C.R.C.P. 251.19(b) or (c). In some instances, the order and notice may issue later than thirty-five days by operation of C.R.C.P. 251.27(h), C.R.C.P. 59, or other applicable rules.